UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DIANA G., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No.  4:22 CV 1245 JMB |
| | ) |
| KILOLO KIJAKAZI, | ) |
| Acting Commissioner of Social | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

**I. Procedural History**

On November 30, 2020, Plaintiff Diana G. filed an application for disability benefits, alleging that her disability began on October 13, 2020, because of depression, back pain, leg pain, anxiety, arthritis, bipolar disorder, and obesity (Tr. 95, 216).  On March 22, 2021, Plaintiff's claims were denied upon initial consideration and reconsideration (Tr. 101-102).  Plaintiff requested a hearing before an ALJ (Tr. 138-139).  Plaintiff appeared at the hearing (with counsel) on October 19, 2021, and testified about the nature of her disability, her functional limitations, and her past work (Tr. 54-89).  The ALJ also heard testimony from Karen Thaler, a vocational expert ("VE") (Tr. 89-93, 311-312).  After considering Plaintiff's testimony and the VE's testimony, and after reviewing the other relevant evidence of record, the ALJ issued a decision on November 18, 2021, finding that Plaintiff was not disabled, and therefore denying benefits (Tr. 22-35).  Plaintiff sought review of the ALJ's decision before the Appeals Council of

the Social Security Administration (Tr. 1-7). On September 27, 2022, the Appeals Council denied review of Plaintiff's claims, making the November 18, 2021, decision of the ALJ the final decision of the Commissioner (Id.). Plaintiff has therefore exhausted her administrative remedies, and her appeal is properly before this Court. See 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

The administrative record before this Court includes records of Plaintiff's medical treatment from October 19, 2019 through January 12, 2022. Plaintiff focuses her arguments on her physical limitations and the effect of her conditions on her ability to maintain regular workplace attendance. As such, the Court will focus on these areas in discussing the medical record.

### A. Disability and Function Reports and Hearing Testimony

Plaintiff was born in June 1963 and was 57 years old on the alleged onset date (Tr. 216). She lives in a house with family (Tr. 273). She has a college degree in software and data entry (Tr. 74, 253-255). She has had earnings throughout her adult life while working various jobs including production work at factories and as a school bus driver (Tr. 225).

In Plaintiff's December 21, 2020 Function Report (Tr. 273-281), she states that her low back pain that radiates to her left leg makes it difficult to stand for more than two hours at a time, sit for more than 45 minutes to an hour, and do the physical work required at her latest job. Prior to her disability, she was able to walk, do household chores without help, and shop for longer periods of time (Tr. 275). However, she currently does not go out often and mostly sits on the porch, cannot do yard work, needs to rest while cooking, has difficulty dressing and sometimes needs help, and shops only for what she needs and for an average for 30 minutes. She has trouble lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and completing tasks; she cannot lift more than ten pounds and cannot sit or walk for too long.

Her medications cause drowsiness, and she uses a (non-prescription) cane as needed. However, she cooks meals, has no trouble with personal hygiene, does some household chores, drives a car, manages finances, socializes, does some hobbies, gets along with others, and can follow directions. As of October, 2021, Plaintiff was taking Prilosec for her stomach, Diclofenac for arthritis, Topiramate for weight, Gabapentin for pain, Cartia XT for heart issues, Pramipexole for restless leg syndrome, and three other medications for depression and sleep issues (Tr. 310).

Plaintiff testified at the October 2021 hearing she would call off work two to three times a week because of back and leg pain at her latest job (Tr. 69-70). When her attendance became a problem, she was placed on short term disability through her employer but never went back to work (Tr. 70). She testified that she has back pain that radiates, that she has numbness and tingling in her feet and legs, arthritis in her feet, ankles, knees, hip, back, and hands, a fluttering heart that creates discomfort, fatigue, and chronic diarrhea (Tr. 72, 74, 80). She testified that she cannot stand for more than twenty minutes because of back and leg pain and that she can sit for no more than thirty minutes (Tr. 70). She further testified that she cannot lift, bend, or squat, or stand while dressing (Tr. 72). She spends time in a recliner or in bed where she takes periodic breaks for relief and she occasionally uses a (non-prescribed) cane (Tr. 70). Her medications make her groggy (Tr. 71). She indicates that she could not work a full-time job unless she can be "up and down every 15 minutes" and has the option to lay down (Tr. 79).[1]

Plaintiff also testified that she drives short distances (Tr. 71). She lives with her husband (who also is disabled) and an unrelated 38-year-old autistic man whom she takes care of by cooking meals and making sure he has what he needs (Tr. 73). She cooks while alternating

---

[1] Plaintiff also testified that she has depression, anxiety, and bipolar disorder which she treats with counseling and medication (Tr. 76-79).

between sitting and standing (Tr. 73). She does some household chores, but her husband does most of them (Tr. 73).

Vocational expert Karen Thaler was asked to testify about the employment opportunities for a hypothetical person of Plaintiff's age, education, and work experience who was able to "perform light work, never climb ladders, ropes or scaffolds, occasionally climb ramps, stairs, balance, stoop, kneel, crouch and crawl, can reach, handle, finger and feel, with [no] concentrated exposure to excessive vibration, with [no] exposure to – with or in proximity to hazardous machinery and unprotected heights" (Tr. 90-91). Ms. Thaler testified that such a person would not be able to perform Plaintiff's past relevant work as performed by Plaintiff at the medium exertional level (Tr. 91). However, she would be able to perform past work as a deli clerk or molding operator as generally performed (Tr. 91). Ms. Thaler further testified that there is some tolerance for unscheduled breaks to use the restroom, and that typical employers only allow 4-6 days of unexcused absences per year (Tr. 92).

### B. Medical and Opinion Evidence

While Plaintiff was still working in October, 2019, she was examined by Dr. Kelly J. Bain, her primary care physician, with complaints of arm pain that began four weeks prior, and numbness and tingling in both feet that had been going on for a few months (Tr. 428). Upon examination, she had an ataxic gait with valgus deformity in both knees and she reported feeling unsteady on her feet (Tr. 428). Dr. Bain noted that Plaintiff's lower extremity neuropathy and gait problems may be secondary to a Vitamin B12 deficiency (Plaintiff has a history of Vitamin B12 deficiency post gastric bypass surgery) and morbid obesity (Tr. 427). Dr. Bain restarted B12 injections, directed her to Dr. David Chalk (an orthopedist) for the gait problems, ordered an EMG (Electromyography) of her lower extremities and an x-ray of her cervical spine, and counseled her on weight loss and daily exercise (Tr. 428-429).

Dr. Chalk's examination revealed that Plaintiff was showing improvement with Neurontin (Gabapentin – used to treat nerve pain) and that she should increase her dosage and follow up in three months (Tr. 427). At that follow up visit on February 12, 2020, Dr. Chalk indicated that Plaintiff's nerve pain was "much improved" with Gabapentin and Diclofenac (also used to treat pain), which she had stopped taking (Tr. 420). She appeared at the appointment with no assistive device and an examination revealed satisfactory range of motion (Tr. 420). He directed her to slowly wean off Gabapentin and to follow up in three months if she still needs to use the drugs for pain management (Tr. 422). At that follow up visit on May 13, 2020, Dr Chalk again directed that she wean off Gabapentin (from 900 mg a day to 600 mg a day) even though Plaintiff indicated that her pain increased while decreasing her medication (Tr. 416, 419). At the time, she was again taking Diclofenac. She appeared at that appointment without an assistive device, complained that her pain was the same as the last visit, and indicated she had intermittent pain that was not present on the date of the appointment (Tr. 416). She again had normal range of motion and motor strength testing at "4+/5" (tr. 418). At subsequent follow up visits with Dr. Bain, on June 16, 2020 and August 5, 2020, and Dr. Chalk on August 17, 2020, no significant changes were made to the treatment plan (Tr. 407, 414).

On August 27, 2020, Dr. Bain ordered additional diagnostic tests (x-rays) of Plaintiff's knee and left hip but indicated that Plaintiff had no injury or "neuro deficits sensory or motor" and that weight loss would be beneficial (Tr. 404). The testing showed mild degenerative changes and she was advised that stress on her joints was due to aging and weight (Tr. 403). She began physical therapy in September 2020 (Tr. 368, 373, 377, 380, 384, 388, 392, and 397). In a follow up visit with Dr. Bain on October 1, 2020, he noted that Plaintiff had some improvement with physical therapy but that she still had pain in the left lower extremity. MRIs of Plaintiff's

spine were ordered, but Dr. Bain advised that Plaintiff needed to lose weight to help her joints and ease her pain and to make her a better candidate for back surgery (Tr. 366-367).

On October 13, 2020, Dr. Bain reviewed the MRI of Plaintiff's spine and noted a symptomatic disc bulge at the L5/S1 level, and other mild degenerative changes, and that her pain symptoms "fit imaging" (Tr. 363). Plaintiff reported that her pain increased with sitting and standing for "to [sic] long" (Tr. 364). Dr. Bain indicated that she would benefit from epidural injections and that she needed to lose weight (Tr. 363). She was referred to a pain clinic and bariatric surgery (intragastric balloon). Plaintiff stopped working around this medical appointment.

On October 30, 2020, Plaintiff initiated treatment with Dr. Lisa Martin Hawver, a bariatric surgeon, in order to lose weight to qualify for back surgery (Tr. 315). Upon examination, she had a normal range of motion (Tr. 320-321). Dr. Hawver could recommend no further surgery and directed Plaintiff to the Mercy Clinic Weight and Wellness (Tr. 323). She was scheduled for an appointment there on December 16, 2020 (Tr. 343).

Plaintiff received lumbar epidural steroid injections for her back pain on November 2, 2020 (Tr. 345)

Plaintiff followed up with Dr. Bain on November 10, 2020 and November 30, 2020 for her back/hip pain that was radiating to her left leg (Tr. 340). Dr. Bain noted that steroid injections were providing limited or only 40% relief from the pain, that she was taking Gabapentin and Tylenol and doing stretches (which did not improve pain symptoms) (Tr. 340, 343). She was scheduled to follow up with the pain clinic on December 18, 2020 (Tr. 340). She also was scheduled for additional epidural injections on January 4, 2021 (Tr. 487). That injection did not provide relief and Plaintiff continued to have bilateral left extremity pain (Tr.

521). She started exercising through the Mercy Clinic Weight and Wellness in January, 2021 to promote weight loss (Tr. 521). As such, on January 28, 2021, the plan included a transforaminal lumbar epidural steroid injection which was given on February 8, 2021 (Tr. 532, 550). At the next appointment on March 10, 2021, she was again offered steroid injections, this time either a bilateral SI joint injection or medial branch nerve block, even though the previous steroid injections were not efficacious, and radiofrequency ablation. Plaintiff declined that treatment (Tr. 557). There are no further treatment notes to April and May, 2021.

Plaintiff began treatment at Compass Health Network in June 2021 and attended weekly counseling sessions through September 2021 (Tr. 631-794) – her physical conditions and medications were reviewed and various diagnostic tests were ordered in July, 2021 (Tr. 795-804). Plaintiff's mental health is not at issue in this appeal; however, information gleaned from those counseling sessions was addressed in the ALJ's opinion and will be recounted here. At those counseling sessions, Plaintiff discussed feeling overwhelmed because of her family situation. At the time, she was caring for an unrelated adult male, caring for her 10 year old granddaughter, and she lived with her husband who was developing early onset dementia. Her physical condition was described as chronic but she generally had normal muscle strength and gait/station. She reported taking a weekend trip to Mississippi (Tr. 680), planning to donate a kidney to a friend (for which she made efforts to lose weight) (Tr. 709. 727), joining a gym where she planned on working about 3 days a week (Tr. 753), travelling to Indiana with friends for the weekend (Tr. 778), and making additional plans to travel (Tr. 790).

After Plaintiff injured her foot in August, 2021 her prescription of Gabapentin was increased from 2 times a day to 3 times a day to address her lower extremity pain (Tr. 807).

Agency Dr. Denise Trowbridge offered an initial determination of Plaintiff's claims on March 22, 2021. Based on the medical records through March, 2021, Dr. Trowbridge opined that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for 4 hours, sit for 6 hours, and would need a 5 minute break every hour to stretch (Tr. 98). Dr. Trowbridge further found that Plaintiff could occasionally climb ramps/stairs and ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl (Tr. 98). In her summary, Dr. Trowbridge noted that Plaintiff would be unable to resume a sustained pace of standing/walking for a 6 hour period in a workday given her impairments, even with efforts at weight loss and rehabilitation (Tr. 99).

When Plaintiff's claim was reconsidered on May 25, 2021, Dr. Judee Bland found the same functional limitations as Dr. Trowbridge (Tr. 107). In explaining her finding, Dr. Bland adopted much of Dr. Trowbridge's explanation but additionally found that Plaintiff did not seek any additional medical care for her physical conditions from March to May 2021 which "suggested clt is not motivated fully to return to substantial gainful activity and is not accurately representing the level of functioning" (Tr. 108).

Plaintiff's treating physician, Dr. Bain, offered an opinion on August 27, 2020 (just prior to when Plaintiff stopped working entirely) that Plaintiff "[l]ikely does have significant pain with prolonged standing due to her morbid obesity" (Tr. 404). .

### III.  Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act. See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process).  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Pate-Fires, 564 F.3d at 942.  "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations."  Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).  If the ALJ holds at step four that a claimant cannot return to past relevant work, the

burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." Id. Stated another way, substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls

outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV.  The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above (Tr. 22-35). The ALJ found that Plaintiff met the insured status requirements through December 31, 2025, and had not engaged in substantial gainful activity since October 13, 2020 (although she received short-term disability benefits to March 28, 2021) (Tr. 24). At step two, the ALJ found that plaintiff had the severe impairments of degenerative disc disease, degenerative joint disease, valgus deformity of the bilateral knees, osteoarthritis, peripheral neuropathy, and morbid obesity (Tr. 25)

The ALJ determined at step three that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment (Tr. 27). The ALJ specifically addressed listing 1.15, 1.16, 1.18, and 11.14 (Tr. 27-28). Plaintiff does not challenge the ALJ's assessment of her severe impairments or his determination that Plaintiff's impairments do not meet or equal a listing.

The ALJ next determined that Plaintiff had the RFC to perform light work, except that she should never climb ladders, ropes or scaffolds, could occasionally climb ramps and stars, could occasionally balance, stoop, kneel, crouch, and crawl, could frequently handle, finger, and

feel, should avoid concentrated exposure to excessive vibration and avoid all exposure to working with or in proximity to hazardous machinery and unprotective heights (Tr. 29).   In assessing Plaintiff's RFC, the ALJ summarized the medical record; written reports from Plaintiff; Plaintiff's work history; and Plaintiff's testimony regarding her abilities, conditions, and activities of daily living.  (Tr. 29-34).  Plaintiff asserts that the RFC is not supported by substantial evidence.

At step four, the ALJ concluded that Plaintiff is capable of returning to her past relevant work as a deli clerk/cook and molding machine operator as generally performed (Tr. 34).  Thus, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act from October 13, 2020 to November 18, 2021 — the date of the decision.  (Tr. 34-35).

## VII.   Discussion

In her brief, Plaintiff argues that the ALJ failed to properly evaluate her ability to stand or walk within a workday and the medical opinions about Plaintiff's physical functioning in fashioning an RFC.

A claimant's RFC is the most she can do despite her physical or mental impairments. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004).  It is the ALJ's responsibility to determine a claimant's RFC by evaluating all medical and non-medical evidence of record.  20 C.F.R. §§ 404.1546, 416.945, 416.946.  In determining Plaintiff's RFC, the ALJ may consider the medical opinion evidence.  "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [her] symptoms, diagnosis, and prognosis; what [she] can still do despite [her] impairments; and [her] physical and mental restrictions."  20 C.F.R. §§ 404.1527(a)(1); 416.927(a)(1) (2017).  While some medical evidence must support the ALJ's RFC finding, there

is no requirement that the evidence take the form of a specific medical opinion from a claimant's physician.  Myers v. Colvin, 721 F.3d, 521, 526-27 (8th Cir. 2013).  "The determination of a claimant's RFC during an administrative hearing is the ALJ's sole responsibility and is distinct from a medical source's opinion."

Given that Plaintiff filed her application after July 12, 2018, new Social Security regulations regarding the evaluation of medical opinion evidence or prior administrative medical findings apply.  20 C.F.R. § 404.1520c.  Under the new regulations, an ALJ is no longer required to "give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," including those from treating physicians.  20 C.F.R. 404.1520(a).  Instead, the ALJ is to consider all medical opinions equally and evaluate their persuasiveness according to several specific factors.  20 C.F.R. § 404.1520c(b)(2).  Of these factors, an ALJ must explain how he considered the factors of supportability and consistency in his decision but need not explain how he considered the other factors.  20 C.F.R. § 404.1520c(b)(2).[2]  The supportability factor provides that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In articulating how he considered the supportability factor, an ALJ may properly consider that the physician's own treatment notes do not support the physician's opinion, that the physician did not consider certain evidence, or that the physician did or did not provide a detailed explanation for the opinion.  Starman v. Kijakazi, 2021 WL 4459720, at *4 (E.D. Mo. Sept. 29, 2021) (listing cases).  The consistency factor states that "[t]he more consistent a medical opinion(s) or prior administrative finding(s) is with the

---

[2] The other factors include the relationship with the claimant, specialization, and other factors which can include whether additional evidence was submitted after the date of the opinion.  20 C.F.R. § 404.1520c(c)(3-5).

Page **13** of **18**

evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

Plaintiff particularly argues that the ALJ failed to make any findings as to her ability to sit and/or stand/walk during a workday even though opinion evidence found limitations. She further argues that even if the ALJ intended to include no limitations in these areas, the lack of limitation is not supported by the medical record. The ALJ made the following findings as to the opinion evidence:

> As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources. The undersigned has fully considered the medical opinions and prior administrative medical findings as follows:
>
> Denise Trowbridge, M.D., State agency medical consultant, found the claimant could lift and/or carry ten pounds frequently and 20 occasionally, stand and/or walk for a total of four hours, sit for about six hours, and would need a five-minute stretch break every hour while sitting. Dr. Trowbridge further found that the claimant could occasionally climb, balance, stoop, kneel, crouch, and crawl, and must avoid concentrated exposure to extreme cold, vibration, and hazards (Exhibit 2A). Judee Bland, M.D., State agency medical consultant, affirmed these findings (Exhibit 4A). These findings are not entirely persuasive. The State agency consultants did provide some support for these findings, noting the claimant's back pain, leg pain, osteoarthritis, and obesity, along with positive straight leg raise, and antalgic gait (Exhibit 2A and 4A). However, these findings are not fully consistent with the overall record that includes later received evidence and hearing testimony. The totality of evidence supports the claimant is not as limited in sitting and standing, is somewhat further limited in climbing, and has limitations in reaching, handling, fingering, and feeling. The claimant does have degenerative disc disease, degenerative joint disease, neuropathy, and a BMI in the obese range (Exhibit 7F/166-175). She testified that she has arthritis and hand pain. Records note some decreased sensation in her feet and left upper extremity, along with a history of shoulder surgery and carpal tunnel release surgery (Exhibit 1F/2, 2F/96-97, and 7F/168). Therefore, the claimant is further limited in climbing, reaching, handling, fingering, and feeling. However, examinations also show that the claimant had normal coordination and balance, she was able to ambulate without assistance, her sensation was intact, and straight

>leg raise was negative (Exhibit 4F/29-40). She was able to work out at the gym three times a week, alternating strength training and cardio (Exhibit 5F/23), spend times with friends and travel. (Tr. 33)
>
>In August of 2020, Dr. Bain indicated that the claimant could do work from a sitting position (Exhibit 2F/72). Dr. Bain did provide some support for this finding, indicating that the claimant likely did have pain with prolonged standing due to morbid obesity (Exhibit 2F/72). Additionally, Dr. Bain's treatment notes indicate the claimant had tenderness and positive straight leg raise (Exhibit 2F/11-12). However, this opinion is not consistent with the overall record. While the record does show that the claimant is somewhat limited, the claimant herself reported that she is able to drive, care for others, travel, and exercise regularly (Exhibit 7F). Furthermore, Examination showed she had normal coordination and balance, she was able to ambulate without assistance, she had full five out of five strength, her sensation was intact (Exhibit 4F/29-40). Therefore, this opinion is not entirely persuasive. (Tr. 33-34).

Thus, the ALJ found that the opinion evidence was somewhat supported and consistent with the record but not to a degree that would support the stand/walk limitations found. The ALJ further found that subsequent medical evidence and Plaintiff's hearing testimony and statements of daily living and activities undermined the sit/stand/walk limitations that were found in the opinions. The medical evidence referred to by the ALJ includes treatment notes from January 28, 2021 where Plaintiff complained of being only able to walk short distances and having to lie down when the pain was "bad" (Tr. 521). However, she was found to have moderate range of motion, normal coordination and balance, and normal gait without assistance (Tr. 528) even though she was also found to have pain (Tr. 531). Thus, she was directed to continue exercising and current medications but to consider additional steroid injections (Tr. 532). And, as set forth above Plaintiff testified and reported that she regularly exercised, travelled, walked without assistance, and cared for others.

Relying on <u>Pfitzner v. Apfel</u>, 169 F.3d 566 (8th Cir. 1999), Plaintiff argues that the ALJ should have "specified the details" of Plaintiff's functional limitations and that failure to do so means that substantial evidence does not support the conclusion that she could return to her past

Page 15 of 18

relevant work.  Id. at 568-569.³  As Plaintiff acknowledges, Depover v. Barnhart, 349 F.3d 563 (8th Cir. 2003) clarifies Pfitzner:  In Depover, the Court found that while the ALJ did not make any specific findings as to sitting, standing, and walking, he "implicitly found" no such limitation because he did not "simply overlook the possibility that [the claimant] was limited with respect to sitting, standing, or walking when he stated his RFC." Id. at 567-568.  Just as in Depover, the ALJ in this case acknowledged that Plaintiff testified that she could only stand for 20 minutes, that she spends all day in bed and a recliner, that she can stand for no more than 2 hours at a time (Tr. 30).  As the quoted passage above indicates, he also acknowledged the limitations on standing given in the three opinions.  Therefore, the ALJ did not overlook Plaintiff's contention that there are limitations in standing and walking; instead, he found that the record did not support such limitations.  As such, simply not identifying a standing/walking limitation is not error when those limitations were considered in the overall opinion.

Plaintiff goes on to argue that, even if the ALJ did not err in failing to specify limitations on standing and walking, he should have found such limitations based on her "significant physical impairments that are inconsistent with the ability to perform light work with unlimited standing and walking" (Doc. 12, p. 8).  Light work includes standing or walking for at least 6 hours in an 8-hour workday with "relatively few unskilled light jobs [ ] performed in a seated position." SSR 83-10.  While diagnostic testing generally revealed mild degenerative changes in Plaintiff's back and hips, Plaintiff notes that she also suffers from a diffuse disc bulge as the L5-S1 her treating doctors believed would cause her pain.  Plaintiff also has had an abnormal gait at times, positive straight leg tests at times, decreased sensation, arthritis, limited range of motion at times, and pain – all the result of or exacerbated by her obesity – which was acknowledged by

---

³ In Pfitzner, the ALJ concluded that the claimant could return to his past relevant work as a truck driver but did not actually articulate the RFC.  See 169 F.3d at 568.  The ALJ in the instance case committed no such foul – he provided a clear statement of Plaintiff's RFC.

the ALJ.  However, she never was prescribed an assistive device, was given conservative treatment that included medication, exercise routines, and dietary changes.  Plaintiff also was given steroid injections that were not entirely efficacious; however, she did not seek any further routine care for her physical conditions after March 2021, including additional and more powerful steroid injections.  This failure to seek additional medical care, coupled with conservative treatments and activities of daily living that included caring for others and travelling, provide substantial evidence supporting the ALJ's opinion.  Brown v. Astrue, 2012 WL 8868789, *14 (E.D. Mo. Mar. 15, 2012) ("Claims of disabling symptoms may be discredited when the record reflects minimal or conservative treatment."); see also Reece v. Colvin, 834 F.3d 904, 909 (8th Cir. 2016) (affirming claimant was not disabled, in part, because claimant's treatment was routine and conservative); see, e.g., Rivers v. Saul, 2022 WL 1080937, at *13 (E.D. Mo. Apr. 11, 2022) (Treatment that does not involve more aggressive treatments than appointments with a psychiatrist, therapy, and prescription medications is routine.).

      The Court is mindful that evidence that Plaintiff exercises, can travel, takes care of others and herself are not indications, in-and-of-themselves, that Plaintiff can engage in meaningful full-time work.  The Court also is mindful that Plaintiff regularly complained of numbness and pain in her lower extremities and that imaging supported her claims of pain.  However, the record also reveals that her medical providers did not encourage drastic therapies and instead encouraged her to lose weight, exercise, and make healthier food choices.  Imaging also described mild or moderate degenerative changes.  Plaintiff's testimony about spending a majority of her time in her recliner or lying down is belied by her activities which include exercising (outside of her home), caring for others, and traveling.  See Steed v. Astrue, 524 F.3d 872, 875-876 (8th Cir. 2008) (noting that self-reported limitations on standing, sitting, and lifting

were belied by activities such as housework, caring for a child, cooking, and driving).  And, based on the record before this Court, Plaintiff failed to follow through with more aggressive and long-lasting steroid injections or at least did not actively pursue further treatment.  See Lawrence v. Saul, 970 F.3d 989, 995-996 (8th Cir. 2020).  The ALJ is permitted to weigh the medical record in fashioning an RFC and his opinion is supported by the substantial evidence in the record as a whole.

\* \* \* \* \*

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly, **IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment shall accompany this Memorandum and Order.

Dated this 4th day of January, 2024

*/s/ John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE